Potter v. Lainhart, et al.—Syllabus.

44  647
46  506
46  510

44  647
50  394
50  395
50  397
50  398
51  436

44  647
54  167

BERNARD M. POTTER, APPELLANT, VS. GEORGE W. LAINHART, F. C. AICHER, R. E. McDONALD, JOHN SEWELL AND S. A.BELCHER, AS COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA; W. J. SHONE, T. N. GAUTIER AND HENRY BROOKER, AS TRUSTEES OF COUNTY BONDS FOR DADE COUNTY; THE DADE COUNTY STATE BANK, A CORPORATION CREATED UNDER THE LAWS OF FLORIDA, AND THE BANK OF BAY BISCAYNE, A CORPORATION CREATED UNDER THE LAWS OF FLORIDA, APPELLEES.

1. A resolution of a board of county commissioners in reference to the issuance of county bonds upon a vote of the people recited that the commissioners deemed it expedient to issue bonds for the purpose of constructing paved, macadamized or other hard surfaced highways, and to erect a court house and jail in the county, and it was therefore resolved by the board that a certain amount of bonds be issued, so much for road purposes and so much for said buildings. The resolution also fixed the denomination of the bonds to be issued, the rate of interest thereon, when and where the bonds and interest were to be, payable, fixed the day for the election and the form of ballot. This resolution was signed by all the members of the board present, constituting a quorum, was recorded upon the minutes of the board and duly published: **Held**, that the resolution was adopted in compliance with Section 591, Revised Statutes, as amended by Chapter 4711, acts of 1899, though the minutes did not recite that the resolution was seconded and formally voted on by the board.

2. The act of 1899, Chapter 4711, amending Section 591, Revised Statutes, is not unconstitutional as embracing more than one subject or because the matter expressed in the act is not properly connected with its title.

3. The special provisions in Sections 592, 593, 594 and 595 of the Revised Statutes and not sections 34 and 35 Chapter 4328, laws of 1895, apply so far as applicable, to elec- tions by the people of a county to determine whether or not county bonds shall issue for the purpose designated in Section 591, as amended in 1899, Chapter 4711.

4. At an election held in pursuance of Sections 592, 593, 594 and 595, Revised Statutes, to determine whether or not county bonds shall be issued for the purposes designated in Section 591, a majority of the vote cast upon the ques- tion submitted determines the result.

5. A resolution of the board of county commissioners, sub- mitting to the vote of the people of the county whether or not bonds should be issued, recited that the commis- sioners deemed it expedient to issue bonds for the pur- pose of constructing paved, macadamized, or other hard surfaced highways, and to erect a court house and jail, and that $150,000 was required for such purpose, $50,000 for such buildings and $100.000 for roads, and the form of the ballot prescribed was "for bonds" or "against bonds:" Held, that under Section 591, Revised Statutes, as amended by Chapter 4711, acts of 1899, and Section 593, Revised Statutes, the commissioners had authority to submit the question to the voters as an entirety, and that a majority vote in favor of the entire issue would au- thorize their issuance.

6 Under the authority to issue bonds contained in Section 591, Revised Statutes, as amended in 1899, Chapter 4711, and the provisions in connection therewith, the county commissioners issue the bonds and they may prescribe their form, and where it appears that in pursuance of a. resolution of the board of county commissioners directing the issue of bonds the form is prescribed, and with the ap- proval of the board the bonds are signed by the chairman of the board, attested by the county clerk, who is ex- officio clerk of the board, and countersigned by the county treasurer, and the bonds recite that they are the bonds of the county and are under the seal of the board

Potter v. Lainhart, et al.—Syllabus.

of county commissioners, this will be sufficient to con-
stitute them bonds of the county.

7. Under the statute, Section 591, Revised Statutes, as
amended by Chapter 4711, Acts of 1899, when the county
commissioners shall deem it expedient to issue bonds for
the purposes, or either of them, mentioned in the section,
they shall determine by resolution to be entered upon
their records what amount of bonds is required for such
purpose and the question under such resolution is
whether such bonds shall be issued. If the vote is in
favor of the bonds, the commissioners are required to
issue such bonds for the purposes specified in the resolu-
tion, and have no authority to issue bonds for any other
purposes than those mentioned therein.

8. Under the statutes in force in this State, county commis-
sioners have no right to issue bonds to erect court houses
and jails until they have provided by resolution a sinking
fund for their redemption. This may be done before the
bnds are advertised and finally disposed of by sale in the
manner authorized by statute.

9. Chapter 4912, acts of 1901, to validate any bonds issued by
any county in this State since the 11th day of May, 1899,
for the purpose of constructing highways, court houses or
jails, or for either of such purposes:     **Held,** (a) not in-
valid on the objection that the Journal did not show that it
was read three times in the  House of  Representatives;
(b) not in conflict with  Article IX, Section  5  of the
constitution, providing that the Legislature shall author-
ize the several counties and incorporated cities and towns.
in this State to assess and impose taxes for county and
municipal purposes and for no other purposes; (c) that
it applies to bonds issued by the officers mentioned in
headnote 6 as being officers authorized by law to issue
county bonds; (d) that it has the effect to validate bonds
coming within its provisions if issued for roads and court
house. when the resolution submitting the matter to a
vote of the people provided for bonds for  roads, court
house and jail, and also bonds issued and disposed of

before the county commissioners provided by resolution a sinking fund for their redemption, and (e) that it applies to and validates the entire issue of $150,000 of bonds issued and disposed of by the county commissioners of Dade county in April, 1901, in the manner and under the conditions stated in the opinion, including those delivered as well as those agreed to be delivered by the county in the future. (CARTER, J. dissents).

10. A bid of a stated amount of dollars for county bonds advertised for sale by county commissioners means that the amount offered, if accepted, must be paid in current money and not evidences of indebtedness against the county.

11. The action of the county commissioners in permitting a bidder for county bonds whose bid has been accepted to withdraw the entire security deposited as required by the county commissioners under Section 597, Revised Statutes, upon making the first payment on bonds delivered, and thereby leaving no security for compliance with the bid as to portions of the bonds to be thereafter delivered, if not entirely discretionary with the commissioners, is an irregularity that may be cured by an act of the Legislature.

12. A member of the board of county commissioners was appointed a member of the board of bond trustees for bonds issued by the county, but before action was taken in reference to his appointment he retired from the board, sent his resignation to the Governor to take effect at once, took no part in the appointment and never thereafter acted as a member of the board of county commissioners; subsequent to his ceasing to be a member of such board a bill was filed to enjoin the county commissioners from proceeding with the bond issue, and no action had been taken by the bond trustees in reference to funds placed to their credit before the hearing on the bill: *Held*, that in refusing the relief prayed in the bill in reference to the bond issue it was not error to then refuse to remove the trustee on the ground he was a member of the board of county commissioners when he was appointed.

Appeal from the Circuit Court for Dade County.

The facts in the case are stated in the opinion of the court.

*Chillingworth & Currie,* for Appellant.

*Geo. M. Robbins and A. E. Heyser,* for Appellees.

PER CURIAM.

The county commissioners of Dade county proposed and undertook to carry out the scheme of bonding the county for $150,000 to build roads and erect a court house and jail. Appellant, a resident taxpayer of Dade county, filed a bill in chancery against the county commissioners, the trustees of county bonds, appointed by the commissioners, and two banks, alleged purchasers of the bonds, the appellees here, and sought to arrest by injunction the further execution of the scheme, and also to have declared void and canceled the bonds executed or issued by the commissioners on various grounds alleged in the bill. The defendants jointly and severally answered the bill and upon a hearing on bill and answer the court dismissed the bill and complainant appealed.

As grounds insisted on in this court for relief the bill alleges that at a meeting of the board of commissioners held on the fourth day of September, 1900, a resolution was introduced proposing that the question of bonding the county for the purpose of raising funds to build a court house and jail and roads should be submitted to the voters of Dade county, but so far as appears by the

official minutes of the board said resolution was never seconded, passed or voted on, nor was there any resolution at any other time passed by the board proposing to submit said question to the voters of the county. It is stated that the resolution as it appears on the minutes of the board was published as required by section 592, Revised Statutes. It is further alleged that at the following October meeting of the board the minutes of the previous meeting were approved, and that the board at said October meeting, acting as though said resolution had been passed, appointed polling places, inspectors and clerks for an election to be held on the sixth day of November following on the question of issuing said bonds. The resolution is made a part of the bill. The answer alleges that the resolution recorded upon the minutes of the board at the September meeting was signed officially by all the members of the board present as shown by the record, and further that while the minutes do not expressly show that the resolution was passed, yet such was the fact, and that previous and subsequent minutes show it in particulars mentioned. It is averred that the minutes of a previous meeting show the adoption of a resolution that at the next regular meeting steps would be taken to call an election to determine whether or not bonds should be issued in the sum of $150,000 for the purpose of constructing roads, court house and jail. The statute, section 591, Revised Statutes, as amended in 1899 by Chapter 4711, provides that "whenever the board of county commissioners of any county in this State shall deem it expedient, or to the best interest of such county, to issue county bonds of their county, for the purpose of constructing paved, macadamized, or other hard surfaced

highways, or erecting a court house or jail, and funding
the outstanding indebtedness of the county, or for any of
such purposes, they shall determine by resolution, to be
entered in their records, what amount of bonds is re-
quired for such purpose, the rate of interest to be paid
thereon, and the times when the principal and interest
of such bonds shall be due and payable." The resolution
recites that the commissioners deemed it expedient to
issue bonds, for the purpose of constructing paved
macadamized or other hard surfaced highways and erect-
ing a court house and jail in Dade county and it was
therefore resolved by the board of county commissioners
of said county that one hundred and fifty thousand dol-
lars was required for such purpose, fifty thousand for
said buildings and one hundred thousand for road pur-
poses. The resolution also fixed the rate of interest on the
bonds to be issued, when and where the bonds and inter-
est were to be payable, and that the resolution be pub-
lished as required by the statute. Also, the sixth day of
November, 1900, was appointed for holding an election at
which the question should be submitted to the legal
voters of the county whether the bonds should be issued.
and the form of the ballot to be used was "for bonds" or
"against bonds." This resolution recorded upon the min-
utes of the board was duly published and the election
held thereunder. The record of the resolution in the
minutes of the board signed by all the members present
in pursuance of the previous recorded resolution was a
sufficient compliance with the statute and no valid ob-
jection to the election exists on the ground stated. The bill
contains allegations that at the meeting of the board in
October, 1900, two of the members present at the Septem-

ber meeting and a new member approved the minutes of the September meeting and thereby ratified such minutes, and that subsequently, in May, 1901, a new board was appointed on which only two of the old members were retained, and that it was not competent for the new board to amend the minutes of the September meeting when the resolution in reference to the bond issue was recorded. The objection sought to be insisted on by such allegations is that the minutes of the September meeting were not sufficient to show the adoption of the resolution and after its approval in October it is not competent for a new board to amend said minutes, even if it be according to the facts then existing. It is not made to appear that either the old or new board passed any resolution or took any action in opposition to the election or the bond scheme, but, on the contrary, it appears from all that was done both boards proceeded to carry out the scheme. The conclusion that the record of the resolution on the minutes of the board at the September meeting was a sufficient compliance with the statute obviates the necessity of making any further reference to the allegations of the bill about amending the minutes.

It is further alleged in the bill that the act of 1899, Chapter 4711, amending section 591 Revised Statutes, oy extending authority to counties to issue bonds for the construction of paved ,macademized or other hard surfaced highways is unconstitutional because it embraces more than one subject and that the matter expressed in the act is not properly connected therewith, and because nothing was said as to how the section was to be amended. The title of this act is, "to amend section 591 of the Revised Statutes of the State of Florida, defining

Potter v. Lainhart, et al.—Opinion of Court.

the purpose for and prescribing and regulating the manner in which county bonds may issue." The subject of the section in the Revised Statutes is county bonds, the purposes for which they may issue and resolution of the commissioners. The section was amended by the substitution of a new section with the amendatory matter added. The designation of the subject matter expressed in the title of the amendatory statute, sufficienty states the subject of the act. State ex rel. Turner v. Hocker, Judge, 36 Fla. 358, 18 South. Rep. 767; Webster v. Powell, 36 Fla. 703, 18 South. Rep. 441. Under the statute as amended the county commissioners had authority to provide for the issue of bonds to construct paved, macadamized, or other hard surfaced highways as well as to build a court house and jail, and fund the outstanding indebtedness of the county.

The bill further alleged that the election was void because held in disregard of sections 34 and 35, Chapter 4328, laws of 1895, to the effect that whenever any public measure shall be submitted to a vote of the people, such measure shall be twice indicated upon the ballot after the list of candidates, followed in each case by the word "yes" and in the other by the word "no" and that a cross-mark shall be made before the proposition that the voter desires to vote for. The statute of 1895 referred to is a general law on the subject of registration of legal voters and to provide for general and special elections. Special provisions are made in sections 592, 593, 594, and 595 of the Revised Statutes for an election by the people of a county to determine whether or not county bonds for the purposes designated in section 591 as amended shall be issued, and in holding such election the special provisions

Potter v. Lainhart, et al.—Opinion of Court.

apply so far as they are made applicable. It is provided in section 593 that at such election "the question shall be submitted to the legal voters of the county whether such bonds shall be issued; and the form of the ballots for such election shall be "for bonds," or" against bonds." It is further aleged that the election was illegal and void so far as bonds for court house and jail are concerned for the reason that at said election a majority of the registered voters of the county did not vote in favor of said bonds. It appears that 817 votes were cast for bonds and .353 against bonds, but it is alleged that 817 was less than a majority of the registered voters of the county. Section 595 Revised Statutes provides that "if it shall appear by the returns of said election that a majority of the votes cast upon the subject shall be "for bonds," the county commissioners shall be authorized and required to issue such bonds as may be necessary for the purposes specified in their resolution as published, and not exceeding the amount therein named." The objection here sought to be raised is that under the twelfth subdivision of section 578, dealing with the powers and duties of county commissioners, they may issue bonds for the purpose of erecting a court house, "provided that no bonds shall be issued except the same shall be ordered by a majority of the registered voters in the respective counties." There can be no doubt that by express provision in section 595 a majority of votes cast upon the subject shall determine whether or not the bonds shall be issued and construing the two sections together it may be inferred that when the legislature employed the terms "majority of the registered voters" in

section 578, it was meant a majority of votes cast upon the subject. The general common law rule is that where the electoral body is indefinite, the majority is estimated upon the basis of the total number of votes cast, and not upon the basis of the number of votes which might lawfully have been cast if the persons entitled to vote had chosen to cast their votes, and under this rule the majority of votes cast should determine the question. Picket v. Russell, 42 Fla. 116, 28 South. Rep. 764, and cases cited; 1 Dillon Municipal Corporations (4th ed.) section 44, note 2, page 78.

It is further alleged that the election was void because no provision was made for the submission to the voters of the county of the question of voting for or against bonds for roads separately, or for or against bonds for court house separately, or for or against bonds for a jail separately; that no statement was made in the resolution as to how much was to be expended for a court house and how much for a jail, but both were lumped together at fifty thousand dollars, and that the manner of the submission to the voters of the county deprived them of a constitutional right to a free exercise of the right of suffrage; and further that the commissioners knew that the scheme to bond the county for $50,000 for a court house and jail alone would not meet the approval of a majority of the qualified voters of the county, and that they fraudulently conceived the plan of submitting $50,000 of bonds for said purpose in conjunction with the bonding for roads which they knew to be popular in order to force a vote in favor of both objects, and that a fraud was thereby perpetrated upon the people of the county. The resolution

42 S. C.

recited that the commissioners deemed it expedient to issue bonds for the purpose of constructing paved, macadamized or other hard surfaced highways, and to erect a court house and jail, and that $150,000 was required for such purpose, $50,000 for such buildings, and $100,000 for roads. This was the submission to the voters and the only form of ballot prescribed was "for bonds" or "against bonds." The answer denied any fraud in fact on the part of the commissioners in submitting the question to a vote of the people and on the pleadings no question of intentional fraud is presented. The manner of submission by the form of the ballot, being for or against bonds in the aggregate, required an approval or rejection of the entire issue as designated. Whether the commissioners had the authority to make the submission as they did depends upon the statute under which they acted. Section 591 Revised Statutes as amended by Chapter 4711, and section 593 Revised Statutes supra. In the opinion of a majority of the court the commissioners had the right, under the authority conferred, to submit the question to the voters as was done, and that a majority vote in favor of the entire issue of $150,000 of bonds would authorize their issuance. A validating act was passed in 1901, Chapter 4912, and in view of the construction placed upon it in a subsequent portion of this opinion, no further discussion will be made in this connection of this objection.

It is further alleged that on or about the first of April. 1901, the chairman of the board of county commissioners, the treasurer of the county and a person representing himself as county clerk executed certain instruments purporting to be bonds which were to be issued in pursuance of the alleged election; that one hundred of said

bonds were of the par value of $1,000 each, fifty were of the par value of $500 each, and two hundred and fifty were of the par value of $100 each, making in all $500,000 par value. It is alleged that the officers mentioned had no authority by statute or resolution of the board of county commissioners to execute said instruments. A copy of the instruments is made a part of the bill and it appears to be the county bond of Dade county, Florida, and recites that the board of county commissioners of said county, "has caused this bond to be executed on behalf of said county by the chairman of said board, attested by the county clerk who is exofficio the clerk of said board, under the seal of said board of county commissioners, and countersigned by the county treasurer." Under the statute the county commissioners issue the bonds, and they have the right to prescribe their form. It sufficiently appears from the answer that under a resolution of the board directing the issue of the bonds the form adopted was by their approval and direction. In Blair v. Cuming County, 111 U. S. 363, 4 Sup. Ct. Rep. 44, it was held that where bonds purport on their face to be issued by the board of county commissioners on behalf of a precinct in the county, and were signed by the chairman of the board and attested by the clerk, who was also clerk of the county, and sealed with the county seal. they were issued by the county commissioners. On the showing made the bonds in question were executed by authority of the county commissioners and are the bonds of the county, though not signed by all the members of the board.

It is further alleged that the instruments executed as the bonds of Dade county in pursuance of the election in

November, 1900, on the question of issuing bonds for roads, court house and jail, do not purport to be issued for said three purposes, but for roads and court house only, it being specifically stated in the bonds that $50,000 was for court house and $100,000 for roads; that it was not the intention of the commissioners to erect a court house and jail in one structure, and they had accepted plans for the construction of a court house to cost $40,000 and it was their intention to build a jail for $5,000, and spend $5,000 on furniture for both buildings. It is recited in the bonds that they are a series of four hundred bonds in the denominations stated for $150,000 for the purpose of erecting a court house and for constructing paved, macadamized or other hard surfaced highways for Dade county, $50,000 for court house and $100,000 for roads, as determined by resolution and order of the board of county commissioners. The advertised notice for the sale of the bonds stated that they were for erecting a court house and constructing roads. The answer admits that the bonds were so executed and it is claimed that they sufficiently complied with the law in this respect, especially in view of the recital that they were executed as determined by resolution and order of the commissioners. The resolution of the board submitting the question of the issuance of the bonds to a vote of the people declared that they were needed to erect a court house and jail and to construct roads. The only other resolution or order of the board in reference to the issuance of the bonds was one passed after the result of the election was ascertained that they be issued. The statute provides that when the commissioners shall deem it expedient to issue bonds of their county for the purposes mentioned,

Potter v. Lainhart, et al.—Opinion of Court.

or either of them, they shall determine by resolution, to be entered on their records what amount of bonds is required for such purpose and the question under such resolution is whether such bonds shall be issued. If the vote is in favor of the bonds the commissioners are required to issue such bonds as may be necessary for the purposes specified in their resolution as published. The commissioners have no authority under the statutes mentioned to issue bonds for any other purposes than those expressed in the resolution. Having undertaken to express in the bonds the purposes for which they were issued all the objects authorized should in strictness have been correctly stated. This irregularity appears upon the face of the resolution and the bonds themselves.

It is further alleged that prior to the alleged issue of any of said bonds the county commissioners did not provide by resolution for a sinking fund for the ultimate redemption of the bonds and that no such resolution has since been passed by the board. The answer admits this to be the fact and says it was an oversight and that the board was desirous of passing such resolution and would have done so, but for a temporary restraining order granted in the case. Section 602 Revised Statutes provides for the levy of an annual tax to pay interest on any bonds issued in pursuance of the act and "also a sum sufficient to meet the amount annually required to be raised as a sinking fund to meet the principal of the bonds, which sinking fund shall be provided for by resolution of the board of county commissioners before the issuing of any of the said bonds." The legislature passed an act in 1893, Chapter 4286, on the subject of levying a tax to pay interest on certain county bonds and to provide for a

sinking fund for their redemption. It provides "that when any county bonds shall have been issued by the county commissioners of any county of the State of Florida, under authoriy of law, for the purpose of erecting a court house, jail, armory, or other county buildings, it shall be the duty of such county commissioner to levy annually, by tax upon taxable property in the county, a sum sufficient to pay the interest upon said bonds, and also a sum sufficient to raise the amount annually required as a sinking fund to meet the principal of the bonds, which sinking fund shall be provided for by resolution of the board of county commissioners before the issuing of any of the said bonds." This act was probably not designed to repeal section .602, which will apply to bonds issued to construct paved, macadamized or other hard surfaced highways, but whether it does or not it is clear that it applies to bonds issued to erect a court house and jail. The sinking fund required by the statute must be provided for by resolution before the bonds are issued, and the objects to be accomplished by this requirement are of such a nature as to make it impossible for us to construe it as merely directory. By the terms of the statute the commissioners have no right to issue bonds until they have provided by resolution for the sinking fund. This may be done at any time before the bonds are issued; that is before the bonds are advertised and finally disposed of by sale in the manner authorized by statute.

In view of what has been said in the two preceding paragraphs we will in this connection consider the curative act, Chapter 4912, laws of 1901. The title of this act is "an act to validate any bonds issued by any county in

the State of Florida since the 11th day of May, 1899, for the purpose of constructing highways, court houses or jails, or for either or any such purposes." It provides that "whenever any bonds of any county of this State may have been issued since May 11th, 1899, for the purpose of constructing any paved, macadamized or other hard surfaced highways, or for erecting a court house or jail, or for either or any such purposes, and the same shall have been intended to be issued pursuant to the provisions of Article 2, Chapter 2, Title 9, Part 1, of the Revised Statutes of this State, as amended by legislation subsequent to the enactment of such Revised Statutes, such bonds shall not be held invalid an occount of any irregularity in the proceedings taken for the issue of the same; but wherever any such bonds have been disposed of by the county authorities for value as required by such provisions of law, then any and all bonds so disposed of shall be of full force and effect the same as if no such irregularity had occurred; provided, however, that nothing herein shall be held to impair the right of any innorent holder for value of any such bond or bonds, or of any one claiming by or through or under any such innocent holder for value, and provided further that this act shall not apply to any bonds issued by any county officers other than those authorized by such provisions of the Revised Statutes as amended." Several objections are made both to the validity of this act and its application to the bonds in question. It is alleged and contended that it is invalid because it was not read three times in the House of Representatives as required by the constitution. We have examined the journal of the House and find this objection to be untenable. The journal, page

1355, shows that Senate Bill 303, the act in question, was reported to the House May 30th, 1901, as having passed the Senate, and that on the same day the rules were waived in the House by a two-thirds vote and said bill on motion was read a second time by its title, and placed on the calendar of bills on the third reading, Subsequently the bill was called up in the House by a two-thirds vote and placed upon its final passage, and after being read in full received thirty-eight votes in its favor, and five against it. Page 1385 Journal of the House. The entries of the journal show the calling up of the bill, its reading and passage by the recorded requisite majority. The contention is that the journal does not show the first reading of the bill, but only the communication from the Senate and the second and third readings. It does appear affirmatively from the entry that it was read the second and third times. The constitution provides, section 17, Article 3, as amended in 1895, that "every bill shall be read by its title, on its first reading, in either house unless one-third of the members present desire it read by sections. Every bill shall be read on three several days, unless two-thirds of the members present when such bill may be pending shall deem it expedient to dispense with this rule. Every bill shall be read by its sections on its second reading and on its final passage, unless on its second reading two-thirds of the members present in the house where such bill may be pending, shall deem it expedient to dispense with this rule. The vote on the final passage of every bill or joint resolution shall be taken by yeas and nays to be entered on the journal of each house." The reqiurement is that each bill shall be read three times, the first only by its title, and the sec-

ond by sections, unless two-thirds of the members present deem it expedient to dispense with this requirement, and the third reading shall be in full. There is no requirement in the constitution as to what shall appear on the journals, except that on the final passage of every bill or joint resolution the vote shall be taken by yeas and nays and this shall be evidenced by the journal. Every presumption must be indulged in favor of proper legislative procedure in the absence of affirmative showing to the contrary, and where entries of such procedure are not required to be entered upon the journal, the court can not presume in the absence of entries that the legislative body did not do its duty. If we are to indulge in any presumptions in reference to the reading of the bill in the present instance we must infer that it was read a first time, as the journal expressly states it was read a second and third time. State ex rel. Turner v. Hocker, 36 Fla. 358, 18 South. Rep. 767; State ex rel. Attorney-General v. Dillon, 42 Fla. 95, 28 South. Rep. 781.

It is further alleged 'that said validating act was in conflict with that provision of Article 9, section 5 of the constitution which provides that the "legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes." In support of this objection decisions in Illinois are cited. The constitution in that State provided that the corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes, such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same," and it was

held that a subscription to stock of a railroad under a vote of the people when there was no legislative authority for so doing could not be validated by the legislature on the theory that it would be the imposition of a debt for local purposes on a municipality against its wishes. Marshall v. Silliman, 61 Ill. 218; Wiley v. Silliman, 62 Ill. 170; Barnes v. Town of Lacon, 84 Ill. 461. In these cases, or some of them it also appeared that the municipal officers that issued the bonds were not the municipal authorities authorized to levy taxes, and it was further held that the issuance of bonds was the imposition of a tax and the legislature had no authority to grant the right of corporate taxation to any but corporate authorities. In the case of Cairo & St. L. R. R. Co. v. City of Sparta, 77 Ill. 505, the city had authority to subscribe bonds to run any period not exceeding ten years that the council might determine and the bonds proposed to be issued provided that they should be payable in not less than twenty years. The legislature undertook to validate the bonds. It was held that they were illegally subscribed and the corporate authorities could not be compelled to issue them as it would be the imposition of a debt for local purposes against their wishes. The validating act in that case did not undertake to compel the issue of the bonds but left it optional with the municipal authorities, and the court refused to direct the issue against their consent. We construed the validating act considered in the case of Middleton v. City of St. Augustine, 42 Fla. 287, 29 South. Rep. 421, as leaving it discretionary with the city authorities to issue the bonds. The curative act of 1901, *supra*, does not undertake to make valid any bonds issued by authority of officers not authorized to levy taxes and represent the fiscal interests of counties,

nor does it appear that such agents, the county commissioners are objecting to the validity of the bonds in question, but on the contrary they are insisting that they are valid, and on carrying out the objects for which they were proposed. This act refers to bonds that may have been intended to be issued pursuant to the provisions of Article 2, Chapter 2, Title 9, Part 1, of the Revised Statutes as subsequently amended, and such provisions contemplate and require a proposition by resolution of the county commissioners to issue bonds and a majority vote of the legal voters of the county voting on the question in favor of the issue. The act undertakes to cure irregularities in the proceedings taken for the issue of bonds proposed by the commissioners and voted for by the people in pursuance of powers already given, and to the extent it goes we do not see that it violates any provision of the constitution. It undertakes to confer no new powers nor to impose any new duties, but simply to validate irregularities in the execution of granted powers, and the accomplishment of this is not the arbitrary imposition of a debt against the county. Whether the legislature can go further than this in curative legislation we need not determine in this case. In the case of McMillen v. Boyles, 6 Iowa 304, it appears that the people of a county voted upon the question of a subscription to three railway companies and this was held to be irregular, principally upon the ground that three distinct and independent measures were submitted together upon such terms that each was made to depend upon the others. The legislature subsequently passed an act legalizing the vote and proceedings and under it the county officials proceeded to collect taxes authorized by the vote. It was held that the power to subscribe for the

stock and issue bonds having been conferred, any defect in the exercise of the power could be cured by the legislature and the action of the officials was sustained. This view has been sustained by the Supreme Court of the United States, and we approve it. Anderson v. Township of Santa Anna, 116 U. S. 356, 6 Sup. Ct. Rep. 413; Bolles v. Brimfield, 120 U. S. 759, 7 Sup. Ct. Rep. 736; Oteo County v. Baldwin, 111 U. S. 1, 4 Sup. Ct. Rep. 265. See, also, Town of Duanesburgh v. Jenkins, 57 N. Y. 177; Schenley et ux. v. Commonwealth, 36 Pa. St. 29; Cooley on Const. Lim. p. 457; Beach on Public Corporations, section 904. Under this rule ,even if it be conceded that there was a defect because of the submission of different bond objects together as was done, it could be cured by legislation. McMillen v. Boyles, *supra*.

It is further alleged that said curative act can not affect the bonds in question because they were executed or issued by officers other than the county commissioners.. The act applies to bonds issued by the officers authorized to issue them under the provisions in Article 2, Chapter 2, Title 9, Part 1, of the Revised Statutes who are the county commissioners of the county. The bonds were executed as we have seen by the authority and under the direction of the commissioners, and in compliance with the statute so far as their execution is concerned. It is also alleged that $50,000 of the bonds for the erection of a court house must in contemplation of law be held to have been issued in pursuance of Article 2, Chapter 1 of Title 9, of the Revised Statutes, but this is denied by the answer, and as therein alleged, it appears that the proceedings for the issue of the bonds were had under Article 2, Chapter 2, Title 9, Part 1 of the revision.

It is further alleged that said curative act is by its title confined to such bonds as were *issued* at the date of its approval, which was May 31st, 1901, and at that time only $50,000 par value had been *delivered* to the banks, the remainder then being held in New York by the county's agent, the United States Mortgage and Trust Company, subject to the order of the county commissioners. From the admitted facts in the record it appears that in March, 1901, subsequent to the canvass of the returns of election for the issuance of the bonds, the county commissioners advertised in the newspapers of Dade county for the sale of $150,000 four and one-half per cent., twenty pear bonds. The notice stated that bids would be received by the commissioners until noon, April 15th, 1901, for $150,000 of bonds for court house and roads to be issued by Dade county in denominations of $100, $500, and $1,000, bonds dated April 1st, 1901, payable at the court house, Miami, Florida, April 1st, 1921, with the privilege of being taken up after the lapse of ten years; the rate of interest is 4½ per cent. per annum, payable semi-annually upon surrender of proper coupons; that $50,000 of said bonds would be delivered for cash April 15th, 1901; $50,000: delivered for cash October 1st, 1901, and $50,000 delivered for cash April 1st, 1902, interest to run only from time cash is paid for the bonds. It was also stated that bids shall specify the amount of bonds and date of delivery bid for the denominations required, the time when the bidder would comply with his bid and whether the bid is in current money, or in evidences of indebtedness against the county; that bidders for amounts in excess of $5,000 should give security by certified check or by bond to the amount of ten per cent. of the bid that the bidder will

comply with the terms of the bid. The right to reject any and all bids was reserved and the fifteenth of April, 1901, fixed for the commissioners to consider bids and allot bonds to bidders. The bid of the defendant banks, which the county commissioners accepted April 15th, 1901, states that they "submit bid for the entire issue of $150,000, Dade county 4½ 20 year court house and road bonds at the following price; one hundred and fifty thousand three hundred and seventy-five dollar ($150,-375.00). We herewith hand you certified check amounting to $15,000 as required by notice of sale. If bonds are allotted to us we agree to pay the balance of $35,000 on the first issue of $50,000 on delivery of said $50,000 of bonds to the Bank of Bay Biscayne at Miami, Florida, on demand." Prior to the advertisement of the bonds for sale the county commissioners through their agent arranged to have the bonds engraved by the United States Mortgage & Trust Company, and, after being executed, for said company to certify that the signatures to the bonds were genuine. The entire amount of bonds were engraved and sent to the county authorities to be exectued before April 1st, 1901, and on that date they were signed and returned to New York to be certified. This was done prior to April 15th, 1901. The Mortgage & Trust Company acted only as the agent for the county in engraving and certifying the bonds for a stipulated consideration, and held them at the time of sale under an agreement on its part to deliver them on the order of the county commissioners to the bond trustees, or to the purchasers upon receipt from them of the purchase price, or to hold them for safe keeping subject to the order of the county commissioners. The banks had seen and were aware of the contents of the bonds before the

day of sale. After the acceptance of the bid of the banks
the county attorney and the chairman of the board of
county commissioners by written communication di-
rected the mortgage and trust company to ship each of
said banks $25,000 par value of bonds of certain denomi-
nations, stating therein that each of said banks had "de-
posited $25,000 to the credit of the bond trustees, making
the first item of $50,000 as per terms of our bond sale."
It is conceded that the bonds were delivered and the
credits given as stated in the written communication.
The remainder of the bonds were in the hands of the
mortgage and trust company when the bill was filed,
June 1901. The answer denies that there was no agree-
ment as to when the $100,000 of bonds not delivered were
to be paid for and avers that the advertisement of sale
specified that $50,000 were to be paid for, April 15th,
1901, which was done, another $50,000 was to be paid
for October 1st, 1901, and the remaining $50,000 on
April 1st, 1902, and that the bid of the banks was based
on this proposition which became a part of the contract
when the bid was accepted, and fixed the times of pay-
ments and delivery of the bonds. It is averred in the
answer that all of the bonds were disposed of before the
commencement of the suit to the banks, and $50,000 par
value were delivered, and $100,000 par value sold for fu-
ture delivery. It is denied that the $100,000 sold for fu-
ture delivery were not *issued* within the meaning of
Chapter 4912, acts of 1901, *supra,* and it is averred that
the bonds were executed April 1st, 1901, and issued and
disposed of April 15th, 1901. In support of such aver-
ments the answer states no facts in denial of those above
narrated. On the admitted facts no doubt can exist, we
think, that the $50,000 of bonds delivered to the banks

are covered by the validating act of 1901. They were sold and delivered, and were clearly *issued* within any definition of this term. Their issuance in the first instance without providing for a sinking fund could have been authorized by the legislature (Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 688), and the omission to pass the resolution in the present case is an irregularity that can be cured by legislation. Whether the curative act of 1901 applies to, or was intended to embrace bonds disposed of under a contract for future delivery, is a question of some doubt, but we are inclined to the view that it does. Its title is "an act to validate any bonds issued by any county in the State of Florida since the 11th day of May, 1899" for certain designated purposes, and in the body of the act it is provided that whenever any bonds of any county of this State may have been issued since the date mentioned in the title for said designated purposes, and the same shall have been intended to be issued pursuant to certain provisions of law, such bonds shall not be held invalid on account of any irregularity in the proceedings taken for the issue of the same, but wherever such bonds have been disposed of by the county authorities for value, as required by such provisions of law, then any and all bonds so *disposed of* shall be of full force and effect the same as if no such irregularity had occurred. The word *"but"* in the act appears to be used conjunctively in the sense of "on the contrary" and connects two clauses of a sentence in such a way as to make the last one qualify or give meaning to the first. It appears from the body of the act that the legislature did not use the word "issued" in the first part in its usual sense of "disposed of and delivered," but in the sense of disposed of for value whether delivered or not. If the

legislature intended the act to apply only to bonds is-
sued in the sense of being delivered, why did they employ
the additional qualifying clause "but wherever such
bonds have been disposed of by the county authorities
for value," then any and all bonds so disposed of shall
be of full force and effect as if no such irregularity had
occurred? When a word which in its application has
different meanings is used in a statute the sense in which
such word is used by the legislature should control in
construing and applying the statute. Gunning v. People,
.86 Ill. App. 174. It appears to us that the conjunctive
clause in the statute, "but wherever such bonds have
been disposed of by the county authorities for value," as
.required by the act, "then any and all bonds so disposed
of shall be of full force and effect the same as if no such
irregularity had occurred," shows the sense in which the
legislature employed the word "issued" in the preceding
sentence, and if such application can be given to the act
under its title it should be so construed. The word
"issued" as applied to bonds usually includes delivery,
but it does not invariably do so. "Issued" the participle
.of the verb "to issue" has several meanings, among
them, "to go forth as authoritative or binding;" "to pro-
.ceed as from a source." Century Dictionary; Issue
(verb) "To send out officially." Websters International
Dictionary. "Issue (verb)". The decisions in Moller v.
City of Galveston, 23 Tex. Civ. App. 693, 57 S. W. Rep.
1116; Kansas Mut. Life Ins. Co. v. Coalson, 22 Tex. Civ.
App. 64, text 73, 54 S. W. Rep. 1081; and Yesler v. City
.of Seattle, 1 Wash. 308, text 322, 25 Pac. Rep. 1014, show
.that the word "issued" may be used in a sense other than

43 S. C.

delivered. In the act construed in the case of Young v. Clarendon Township, 132 U. S. 340, 10 Sup. Ct. Rep. 107, the word "issued" did not mean final delivery. The sense in which the term is used by the legislature should be ascertained from the entire act. Our constitution ordains that "each law enacted in the legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title." This provision is mandatory, and the rule of construction we have adopted is to enforce its restrictions in all cases coming within the mischiefs intended to be arrested, while in cases not falling within them a liberal construction should obtain. One of the leading objects of the provision is to prevent the incorporation into one act of more than one subject and matter properly connected therewith, and thereby to prevent what has been called "log rolling" legislation. The subject of the act must be expressed in the title, but matters of detail, or matters properly connected with the subject need not be there stated. When the subject is general with no restrictive features and the matters in the body of the act are properly connected therewith the act must be sustained, and if serious doubt exists as to whether the matter found in the bill is properly connected with the subject in the title the decision must be in favor of the legislative power. County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, 18 South. Rep. 339; State ex rel. Attorney-General v. Burns, 38 Fla. 367, 21 South. Rep. 290; State ex rel. Turner v. Hocker, Judge, 36 Fla. 358, 18 South. Rep. 767. In the case last cited it was held that no matter from what standpoint the assault is made upon the statute it is a cardinal rule that nothing but a clear violation of the constitution will

justify the courts in overruling the legislative will, and where there is a reasonable doubt as to the constitutionality of an act it should be upheld. The word "issued" as applied to bonds may mean disposed of for value and the entire act of 1901 shows such to have been its meaning by the legislature. On the admitted facts in this case we think no doubt can exist that the county authorities had disposed of the entire issue of $150,000 of bonds to the defendant banks on the fifteenth of April, 1901, for more than par value of the bonds. The joint answer of the commissioners and banks alleges that such was the fact. Those disposed of for future delivery must be paid for before the banks are entitled to possession, but under the facts stated and admitted, a valid contract exists between the parties as to the disposal of the bonds. If we were to hold that the $100,000 not yet delivered are not issued within the meaning of the act it would not affect the validity of the bonds executed, and the sinking fund resolution might still be passed and this portion of the bonds sold again. If not issued the requirement in reference to designating in the bonds the objects for which they were authorized, would necessitate a new execution of the bonds, but we hold that the curative act applies to bonds disposed of and cures irregularities in the proceedings taken for their disposition.

The bill alleges that the notice for bids for the bonds was published more than thirty days before the date fixed for opening bids, and the answer admits that the notice was published a little in excess of thirty days. The object of the statute was to require *at least* thirty days notice in order to provide that time to secure bids and it is admitted that full time was given in this case.

It is also alleged that the bid put in by the banks did not state whether payment was to be made in current money or evidences of indebtedness against the county. We construe the bid to be for money and the banks will have to make payment in current money.

It is still further alleged that the banks did not give bond with surety that they would comply with their bid, and that the county authorities allowed them to withdraw the certified check deposited in the payment of the first $50,000 of the bonds. The security tendered with the bid made by the banks was a certified check for $15,000, and this form of security was permissible under the terms of advertisement of the bonds. It is admitted that the amount covered by the certified check was withdrawn in the payment for the bonds delivered. The answer of the commissioners states that they authorized this on account of the known solvency and reliability of the accepted bidders who were home institutions. The statute in reference to security on the part of bidders, section 597, Revised Statutes, is probably discretionary with the commissioners, but whether so or not the action of the commissioners in allowing the security to be withdrawn is an irregularity in the disposition of the bonds covered by the curative act. Under the terms of sale the times of payment for bonds as construed by all parties, are those stated in the notice of sale advertised by the commissioners. ,

The bill further alleges as matter independent of the issuance of the bonds that W. J. Shone, one of the bond trustees, was a member of the board of county commissioners when appointed, and that all of the members were appointed one day before the resolution appointing

them was introduced. No other objection is urged against them. The answer denies that the trustees were appointed one day before the resolution appointing them was introduced, and under the allegations, which must be taken as true, no, valid objection exists as to any of the members on the alleged ground that no resolution was introduced before their appointment. It appears from the answer that Shone was a member of the board of county commissioners on the day he was appointed, but that before any action was taken in reference to his appointment he retired from the board and sent his resignation to the Governor to take effect at once; that he took no part in his appointment, and has never since acted as a member of the board of commissioners. The bill shows that when it was filed Shone was not a member of the board and it also appears from the record that the trustees have taken no action in reference to the funds placed to their credit in consequence of a temporary injunction granted in the case. Conceding that a member of the board of county commissioners can not act as a member of the board of bond trustees, there appears no sufficient reason for excluding Shone from the board on the facts stated. For ought that is shown he may now act as trustee and we think there was no error under the circumstances in the action of the court in not removing him.

The decree of the Circuit Court should be affirmed, and it is so ordered.

CARTER, J., dissenting.

I am unable to concur in the view announced in the opinion in this case that the $100,000 of bonds in the hands of the trust company in New York have either been

"issued" within the meaning of that word as used in the title of Chapter 4912, laws of 1901, or that they have been "disposed of for value;" within the meaning of those words as used in the body of that act. I am also unable to agree to the proposition that in ascertaining the meaning of the title of an act the body thereof can be taken into consideration so as to cut down the natural ordinary meaning of the words used in the title, when determining the propriety of an attack upon the body of such act as being beyond the scope of the title and therefore, unconstitutional. The constitution requires the subject of the act to be briefly expressed in the title. We must therefore first interest the title by its language alone to determine what it means. If the title is so framed as to apply equally to one of two subjects, then either subject may be legitimately legislated upon in the body of the act, but if the title according to the ordinary plain meaning of the words used therein embraces a particular subject, this meaning cannot be altered by looking to the body of the act where similar language is used, but evidently in a different sense. I understand the rule to be that the title can be considered in determining the meaning of the body of the act, but the court in this instance reverses the rule entirely and if the rule announced is to prevail then in every case of ambiguity or doubt as to the meaning of the title, or of conflict between the title and the body the entire act must be considered in determining the meaning of the title. Such a rule eliminates from the constitution one of the most salutary safe-guards against vicious legislation. Northwestern Manf'g Co. v. Wayne Circuit Judge, 58 Mich. 381, 25 N. W. Rep. 372.

Potter v. Lainhart et al.—Dissenting Opinion.

The title of the act under consideration is "an act to validate any bonds issued by any county in the State of Florida since the 11th day of May, 1899, for the purpose of constructing highways, court houses or jails, or for either or any such purposes." It is conceded in the opinion that the ordinary meaning of the word "issued" when applied to bonds and commercial instruments, includes the idea of delivery. The definitions quoted from the dictionaries "to go forth as authoritative or binding" "to proceed as from a source" "to send out officially" each include the idea of a fully completed transaction including delivery where that is necessary. The words "bonds issued by any county" used in the title are not accompanied by other language indicating that a restricted meaning is to be given the word "issued" as was the case with language construced in the decisions by the United States Supreme Court and the Texas and Washington courts cited in the opinion. In those cases while the meaning I contend for was recognized as the plain ordinary meaning of the word issued, yet the context showed that such meaning was not there intended, and in that very essential respect those decisions differ from ours. If there is nothing in the title showing that the legislature used the word issued in a sense more limited than it would ordinarily and naturally bear, then I think we are not justified in giving it such limited meaning because language is used in the body of the act showing that the same word there used is intended to have such limited meaning. But aside from this, I do not think there is anything in the body of the act tending to show that the word "issued" as used in the title or the body was to have a restricted meaning. On the contrary I

think the words "disposed of·for value," show clearly
that the legislature did not intend  to  validate  bonds
merely contracted to be sold, or sold for future delivery,
where the purchase money had not been paid and where
the bonds had not only not been delivered, but were still
in the hands of the agents of the county subject to its
order.  The words "disposed of for value", convey the
idea of delivery and payment of the purchase price and
therefore this expression is not only fully as broad but
broader than the word "issued."  If the legislature knew
the facts with regard to the Dade county bonds, and in-
tended to validate all of them it  could not  have  used
language more inappropriate to accomplish that result.
It is safe to say that if the facts were known, and it were
intended to validate all the bonds very different language
would naturally have been used.  The entire scope of the
act seems to be to protect purchasers who have spent
their money for bonds that are of doubtful validity be-
cause of irregularities in the "proceedings taken for the
issue of the same," and not to validate bonds  in  the
hands of the county authorities in order to enable them
to sell the same.  The contract between the banks and
the county for the $100,000 of bonds at the time of the
passage of the validating act could not have been en-
forced against either party, because the bonds, the sub-
ject-matter of the contract were invalid, and  the  pur-
chaser needed no protection, having paid out nothing
for such bonds, and having a complete defense against
any claim by the county for failure to take and pay for
the bonds under the accepted bid.  The act applies only
to bonds "disposed of for value," not  to  bonds  "con-
tracted for future delivery." ·   The purchaser had not

paid one dollar for the bonds which the county is held to have "disposed of for value," nor had the county received a dollar on account of such bonds. How can it be said that under these circumstances the bonds have been disposed of for value? I think the interpretation given the validating act in this case is too liberal in view of the language used, and the evident purpose for which it was framed, and therefore dissent from the conclusion announced that the $100,000 of bonds now in the hands of the trust company in New York were validated by that act .