JENS MOLLER ET AL. V. CITY OF GALVESTON ET AL.

Decided June 14, 1900.

1. **Municipal Bonds—When "Issued."**

The act of the Legislature forbidding the issuance of municipal bonds unless a proposition for their issuance shall have first been submitted to the popular vote, took effect August 26, 1899. Certain bonds of the city of Galveston had been duly executed by the city, had been approved by the Attorney-General, and were ready for negotiation and delivery, except that the State Comptroller had not registered them, although they had been deposited with him for that purpose on August 24, 1899. Held, that their deposit with the Comptroller for registration left nothing but a ministerial act to be performed by him, which should be regarded as done on the day of the deposit, and that the bonds had already been "issued" within the meaning of the law when the Act of 1899 took effect, and their validity was not affected by the requirements of that statute.

2. **Local Law—Publication of Notice of Intention.**

The requirement of article 3260, Revised Statutes, providing that notice of intention to apply for the passage of a local law shall be published "at least once a week for a period of thirty days" prior to the introduction into the Legislature of the bill therefor, is complied with by a publication made once a week for four successive weeks, the first publication being made thirty days before the introduction of the bill.

3. **Same—Legislature Sole Judge as to Compliance.**

The pasage of a local law by the Legislature must be held as conclusive of the fact that due notice of intention to apply therefor was given, as the Constitution requires evidence of the publication of such notice to be exhibited to the Legislature before such law shall be passed.

4. **Municipal Bonds—Constitutional Law—Gulf Coast Cities.**

The provision of the Constitution (section 7 of article 11) giving authority to counties and cities bordering on the Gulf of Mexico to create a debt for construction of sea walls, breakwaters and sanitary purposes upon a vote of the taxpayers as may be authorized by law, does not prohibit the Legislature from giving the power to be exercised in some other manner, and a city sewerage system is for "sanitary purposes."

5. **Same—Delay in Issuance—Antedating.**

Municipal bonds are not rendered invalid by the fact that they are not issued until nearly two years after the passage of the ordinance providing for them, nor by the fact that, as authorized by the ordinance, they are antedated.

APPEAL from Galveston. Tried below before Hon. WILLIAM H. STEWART.

*Davidson, Minor & Hawkins,* for appellants.

*James B. Stubbs,* for appellees.

GARRETT, CHIEF JUSTICE.—This action was brought by Jens Moller and other taxpayers of the city of Galveston to restrain the city authorities from negotiating bonds of the city amounting to $300,000, which had been executed to raise money for the construction and establishment of a sewerage system, and to cancel and annul said bonds, to restrain the levy and collection of taxes to pay the interest thereon and to create a sinking fund for the payment thereof, and to recover back from

the city taxes that had already been collected from the plaintiffs for that purpose. It was averred that the proposition to issue said bonds had never been submitted to a vote of the property taxpayers of the city of Galveston, and that for that and other reasons alleged in the petition the bonds about to be sold by the city were invalid.

In defense the city pleaded authority to issue the bonds; its compliance with the law in their execution; and that an obligation had already been incurred in the establishment of a sewerage system in the sum of $93,600, for the value of the plant of the Galveston Sewer Company, by arbitration had in accordance with its charter, and for which sum judgment had been rendered against the city. A trial below by the court, without a jury, resulted in a judgment sustaining the legality of $93,600 of the bonds, and declaring the remainder invalid and canceling the same and restraining the city from selling them. The court denied plaintiffs a recovery for the taxes paid by them. Both parties have appealed.

The city of Galveston is legally incorporated and its charter is made a public act, so that it may be read in evidence without proof, and judicial notice taken thereof. Charter of Galveston, sec. 169, Spec. Laws 1896, p. 43. General power is conferred by the charter upon the city council to put drains and sewers in the streets, alleys, public grounds, and highways of the city; and "to establish, erect, construct, regulate, and keep in repair bridges, culverts, and sewers, sidewalks and crossways, and to regulate the construction and use of the same," etc. Charter of Galveston, secs. 34, 35. By an amendment to the charter passed in 1891 the city was authorized to issue bonds to procure a water supply and for the erection of an efficient system of sewerage and drainage. A special act was passed by the Twenty-fifth Legislature, entitled "An Act to amend the charter of the city of Galveston by amending sections 39, 116, 127, and by adding thereto sections 90a, 132d, 132e, 176, 188a, 188b, 188c, 188d, 188e, 188f, 188g, 188h, 188i, 188j, 4a, 6a, 72a, 91, 92, 93." Special Laws, p. 88. Article 132d, added to the charter by this act, gave the city power, in addition to the issue of bonds provided for in section 132c, to issue $200,000 for the payment of the floating general indebtedness of the city and $300,000 "for the construction and establishment of a sewerage system." This section, among other provisions, also contained the following: "The city of Galveston shall acquire by purchase the plant of the Galveston Sewer Company, the value of said plant to be ascertained by arbitration, the city of Galveston to appoint one arbitrator, the Galveston Sewer Company another, and the two so appointed to name a third man, the determination of a majority of the arbitrators to be final and binding on both parties." This amendment became effective ninety days after adjournment of the Legislature. An unsigned notice of an intention to apply to the Legislature for the passage of this act was published in the Galveston Tribune, a newspaper published in the city of Galveston, on the 6th, 13th, 20th, and 27th days of December, 1896, and no other publication thereof was made. It was as follows:

"LEGAL NOTICES.

"Notice of Application to Amend the Charter of the City of Galveston.

"To all whom it may concern: Notice is hereby given that application will be made by a joint committee appointed for that purpose to amend, revise, alter, change, and re-enact the charter of said city of Galveston, in the following particulars, to wit:

\* \* \* "Second. An amendment authorizing the issue of three hundred and fifty thousand dollars of five per cent semi-annual bonds, to be used for the construction of a city sewerage system." \* \* \*

The city of Galveston borders on the coast of the Gulf of Mexico, and has more than 10,000 inhabitants. The plaintiffs are resident citzens and property taxpayers of the city of Galveston, and have been since before the year 1897.

On December 11, 1897, the city council duly passed "an ordinance to provide for the issuance, sale, and redemption of bonds in the sum of three hundred thousand dollars, for the construction and establishment of a sewerage system in the city of Galveston, under and by virtue of section 132d of the charter of the city of Galveston, as enacted by the Twenty-fifth Legislature of the State of Texas, at its regular session May 19, 1897, to be styled sewerage bonds of the city of Galveston." Section 1 of the ordinance is as follows:

"Section 1. That the mayor of said city and the committee on finance and revenue of the city council of said city be, and they are, hereby authorized and instructed to have printed and engraved bonds of the city of Galveston to the amount of three hundred thousand dollars, which will be styled 'sewerage bonds of the city of Galveston.' These bonds are issued under and by authority of section 132d of the charter of the city of Galveston, as enacted by the Twenty-fifth Legislature of the State of Texas, at its regular session on May 19, 1897. Said bonds shall be payable forty years after the respective dates of their issuance, to bearer, at the office of the treasurer of the said city of Galveston, or, at the option of the holder thereof, at the fiscal agency of the city of Galveston in the city and State of New York; shall bear interest at the rate of five per cent per annum, payable semi-annually, and shall have attached thereto eighty coupons, each of which shall represent the interest due for six months on the bond to which it is attached; said coupons shall be payable at the office of the treasurer of said city, or, at the option of the holder thereof, at the fiscal agency of the city of Galveston in the city and State of New York. Said bonds shall be issued under the seal of the city, signed by the mayor and countersigned by the city clerk. Each bond shall be for the sum of one thousand dollars, and the bonds shall be numbered consecutively from one to three hundred, inclusive. They shall be sold as needed, for cash, and at not less than par. They shall be registered by the city clerk in a bond registry book kept for that purpose, and it shall be the duty of the mayor, as soon as said bonds shall have been issued, and before such bonds are offered for sale, or before the sale of said portion of them as may be needed,

to forward the same to the Comptroller of the State of Texas for registration by the Comptroller of the State, after approval by the Attorney-General, as required by the registration law of the State of Texas."

Section 2 reserves the right to redeem any of the bonds after the dates of their respective issuance, and provides for the manner of their redemption. Section 3 is as follows:

"Section 3.   To provide for the payment of interest on said bonds, and to create a sinking fund of two and one-half per cent for the redemption of the same, there is hereby levied and set apart and specially appropriated an annual ad valorem tax on all property, real, personal, and mixed, within the said city of Galveston, not exempt from taxation by the Constitution and laws of the State of Texas, of and at the rate of ten cents on the one hundred dollars valuation of all said property, and such tax, or so much thereof as may be necessary, shall be assessed and collected annually, until the principal and interest of said bonds are fully paid up and discharged."

Section 4 sets aside and appropriates the interest and sinking fund so levied for that special purpose, but provides for its investment from time to time in bonds of the city, and for the punishment of any officer of the city for misapplication thereof.   Section 5 is as follows:

"The mayor of said city and the committee on finance and revenue of said city council are hereby authorized and empowered to negotiate and sell said bonds as and when needed; provided, however, that none of said bonds shall be sold for less than par, or except for cash; and provided, that the proceeds of the sale of said bonds shall not be used for any other purpose than those described by section 132d of the charter of this city as enacted by the Twenty-fifth Legislature on May 19, 1897."

The assessment value of the property of the city of Galveston for the year 1897 was $27,278,579, and for the year 1899, $26,777,338.   The sewerage tax as provided for in section 3 of the foregoing ordinance was assessed for 1897, and the plaintiffs paid the tax for that year, to wit, Jens Moller $32.87 and Fannie Mellon $2.40.   There has been no assessment of the tax for any other year.   The city budget for year March 1, 1897, to March 1, 1898, contains $22,500 for proposed issue of sewerage bonds.

The execution of the bonds was delayed until August, 1899.   In the meantime there had been a suit brought affecting the validity of the tax, and an arbitration was had between the city and the Galveston Sewer Company to ascertain the value of the plant of the company.   An award was made by the arbitrators fixing $93,600 as the value of the plant, and judgment upon this award was rendered against the city August 3, 1899, by the District Court of Galveston County for the Tenth Judicial District, for the amount of the award, and against the company in favor of the city for the entire plant, system, etc., of the Galveston Sewer Company.   Execution was issued against the city on this judgment and was returned nulla bona.   It has never been paid.   The plant remains in the hands of the company.

On August 21, 1899, the city council passed a further ordinance concerning the issuance, sale, and redemption of the bonds as follows:

"Whereas, there was enacted by this council on the sixth day of December, 1897, an ordinance providing for the issuance, sale, and redemption of bonds in the sum of three hundred thousand dollars, for the construction and establishment of a sewerage system in the city of Galveston, under and by virtue of section 132d of the charter of the city of Galveston as enacted by the Twenty-fifth Legislature of the State of Texas, at its regular session May 19, 1897, to be styled 'sewerage bonds of the city of Galveston,' which said ordinance was approved by the mayor of Galveston, December 11, 1897; and whereas said bonds have not been issued.

"Now, therefore, be it ordained by the city council of the city of Galveston:

"Section 1. That said bonds, when issued, shall be dated as of August 1, 1899, and the coupons thereto attached shall mature and become due on the first days of February and August.

"Section 2. That the signature of the mayor and city clerk of the city of Galveston may be printed, lithographed, or engraved upon the coupon attached to said bonds, and that the printing, lithographing, or engraving of said signatures shall have the same force and binding effect as though said signatures had been made by the writing thereof.

"Section 3. That this ordinance shall be in effect and in force from and after the date of its passage."

This ordinance was passed at a special session. All of the members of the council were present except one, who however had received personal verbal notice of the meeting by the mayor given a few minutes before the meeting and within a few feet of the council chamber.

In conformity with the ordinance of the city passed December 11, 1897, and the amendment thereof passed August 21, 1899, the bonds in controversy, to wit, three hundred bonds of the denomination of $1000 each, were, on August 23, 1899, duly executed, bearing date August 1, 1899, as provided by the ordinance passed August 21, 1899. They were certified by the Hon. T. S. Smith, Attorney-General of the State, on August 24, 1899, as required by law, and were deposited with the Comptroller for registration August 24, 1899. They were registered by the Comptroller August 30, 1899. On August 25, 1899, published notice was given inviting bids for the purchase of the bonds, and circulars were issued on that date and mailed by the auditor of the city to several dealers in bonds inviting propositions. A number of bids were received, and on September 16, 1899, one of them was accepted by the city for the entire series, but on account of the legal question growing out of the fact that no proposition for the issuance of the bonds had been submitted to the vote of the taxpayers, the bidder refused to take the bonds, and they have never been negotiated or sold and are still in the custody of the city treasurer, without having ever been delivered to any purchaser thereof.

The act requiring county commissioners and city councils to submit propositions for the issuance of bonds to a vote of the property taxpayers became effective August 26, 1899. At that date the bonds in controversy in this suit had been duly executed by the city and were ready for negotiation and delivery, except that the Comptroller had not registered them, although they had been deposited with him for that purpose on August 24th. By the act referred to it is unlawful for the commissioners court of any county, or the city council of any incorporated city or town in this State, to issue bonds of said county or town or city, for any purpose authorized by law, unless a proposition for the issuance of such bonds shall have been first submitted to a vote of the qualified voters, who are property owners of said county, town, or city, and unless a majority of the said qualified property taxpayers, voting at said election, is in favor of the proposition for the issuance of such bonds. Gen. Laws 1899, p. 258. Since the proposition to issue the bonds involved in this suit was never submitted to a vote of the qualified taxpayers of the city of Galveston, they would be invalid if they had not been issued within the meaning of the law before it become effective, that is to say August 26, 1899. Before the passage of the law the proposition to issue the bonds would be determined by the ordinance of the city council providing for their issuance. The purpose of the law is to have the proposition submitted to a vote of the qualified property taxpayers. It is the question of issuance or not that is to be determined in either case. It is not a question of the liability of the city to a purchaser of the bonds to whom they have been sold and delivered. So no strict definition should be given to the word "issued" in construing the law. Whether the meaning should be when it has been determined to issue the bonds, or when they have been executed and are ready for negotiaton, or when they have been finally negotiated and sold, should be determined from the nature of the case and a comparison of the provisions of the statute with other statutes on the same subject.

An act was passed April 29, 1893, regulating and restricting the issuance of bonds by counties, cities, and towns. Gen. Laws 1893, p. 84. Among other things, it provided that any county, city, or town desiring to issue bonds shall, before such bonds are offered for sale, forward to the Attorney-General the bonds to be issued, together with copies and statements furnishing information to show whether the law has been complied with, and it is made the duty of the Attorney-General "to carefully examine the said bonds in connection with the facts and the Constitution and laws on the subject of the execution of such bonds, and if, as the result of such examination, the Attorney-General shall find that such bonds were issued in conformity with the Constitution and laws, and that they are valid and binding obligations upon such county, city, or town by which they are executed, he shall so officially certify." This law further provides that after the bonds have received the certificate of the Attorney-General and have been registered in the Comptroller's office, which is required by the law, they shall be held in every

action, suit, or proceeding in which their validity is or may be brought into question prima facie valid and binding obligations; and the certificate of the Attorney-General is made evidence of the validity of the bonds. Section 8 of the act provides that "nothing in this act shall be construed to apply to the issuance of any bonds in cases where provisions for their issuance have been made, in whole or in part, before the passage of this act."β The Act of 1899 does not in any way amend or repeal the Act of 1893, except to require the submission of the question of issuance to a vote of the qualified property taxpayers. There is a proviso in the act that it "shall not be construed to authorize and render valid bonds without being first submitted to the Attorney-General, and certified to by him, as now required by law."

The amendment to the charter authorizing the issuance of the bonds uses the following language in requiring them to be sent to the Attorney-General for examination, to wit: "Said bonds shall be signed by the mayor and countersigned by the city clerk, and shall be payable at such places as may be fixed by ordinance of the city council. It shall be the duty of the mayor, when such bonds are issued, to forward the same to the Comptroller of the State, whose duty it shall be, after approval by the Attorney-General, to register them in a book kept for that purpose, and to indorse on each bond registered his certificate of registration. The Act of 1893 requires the county, city, or town desiring "to issue" bonds before they are offered for sale, to forward the bonds "to be issued" to the Attorney-General, who, if upon examination he shall find that they "were issued" in conformity with the Constitution and laws, and that they are "valid and binding obligations upon such county, city, or town by which they are executed," shall so officially certify; and the enabling act or amendment to the charter requires the bonds "when issued" to be forwarded for the approval of the Attorney-General and registration by the Comptroller. Construing these expressions in the several acts, all relating to the issuance of the bonds, and bearing in mind the purpose of the law to obtain the assent of the taxpayer to the creation of the debt to be evidenced by the bonds, and considering the proviso for the reference of the bonds to the Attorney-General, whose certificate is the final act making them prima facie valid, the prohibition, "shall not be issued," must be referred to the execution of the bonds. The bonds have been "issued" when they have been duly executed. Their deposit with the Comptroller for registration leaves nothing but a ministerial act to be performed by him, which should be regarded as done on the day of the deposit.

Several cases have been cited by counsel for plaintiffs in support of the meaning "issued" in the sense of "delivered." Anthony v. County of Jasper, 101 United States, 693, refers the date of issuance to the date of execution, as the following language will clearly show, the court saying: "There can be no doubt that it is within the power of the State to prescribe the form in which municipal bonds shall be executed in order to bind the public for their payment. If not so executed, they

create no liability. * * * That Anthony was charged with notice that Merwin (who signed the bonds) was not the presiding justice of the county court until October, 1872, and that he could not have signed the bonds in his official capacity until that time. Had he signed them in March, he could not have bound the township for their payment. This is equivalent to notice that they were not in fact issued before March 30, and consequently they were not valid because not certified by the auditor of the State."

In the case of Young v. Clarendon Township, 132 United States, 340, the complete issuance of the bonds depended upon the certificate of the Governor of Michigan to the Treasurer of the State, with whom they had been conditionally deposited, that the railroad company had built its road as contracted. The question was whether or not the township was liable upon the bonds. The court said:

"To the Governor, and the Governor alone, was given the power to determine whether the bonds should ever in fact issue, and if issued, when they should issue. For to him was committed the decision of the important question whether the railroad had performed its part of the common undertaking. His certificate was to be the evidence of that fact, and the only admissible authentication of it to the trustee, the depositary. So far as the investigation and determination of that question were concerned, and the certifying of it, the Governor was to discharge that function in the process of issuing the bonds which was imposed on the auditor in the case of Anthony v. County of Jasper, supra, the difference being that in that case the certificate was to be indorsed on the bonds themselves, but not so in this case."

The case of Brownell v. Greenwich (New York Court of Appeals), 4 Law Reports Annotated, 685, is more nearly in point, but the conclusion of the court is reached in the following guarded language: "Under the circumstances, we think that the delivery of the bonds to the plaintiff determine the date when his bonds were issued." It is true that no obligation is created upon the bond until it has been sold and delivered, but "issued" as it is used in the enabling acts is a relative term. It may mean "executed" under some circumstances and "delivered" under others. The case of Yesler v. Seattle, 1 Washington, 322 (25 Pacific Reporter, 1014), recognizes two phases of meaning. The court says: "In financial parlance the term 'issue' has two phases of meaning. 'Date of issue,' when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the time for which they run, without reference to the precise time when convenience or state of the market may permit of their sale or delivery, and we see no reason why the Act of March 26, 1890, should not have that interpretation. When the bonds are delivered to the purchaser, they will be issued to him, which is the other meaning of the term."

Our conclusion is that the bonds had been "issued" within the meaning of the law when the Act of 1899 went into effect, and the fact that

the proposition to issue them was not submitted to the property tax-payers does not render them invalid.

The Constitution prohibits the passage by the Legislature of any local or special law unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be af-fected is situated, which notice shall state the substance of the con-templated law and shall be published at least thirteen days prior to the introduction into the Legislature of such bill and in the manner to be provided by law. The evidence of such notice having been published, is required to be exhibited to the Legislature before such act shall be passed. Const., art. 3, sec. 57. The manner of publication is provided by Revised Statutes, article 3260, as "at least once a week for a period of thirty days." The first publication of the notice of the intention to apply for passage of the law in question was made more than thirty days prior to the introduction of the bill, and once a week for four successive weeks. There can be no more than four entire weeks in thirty days, and a publication once a week for four successive weeks, the first having been made thirty days before the introduction of the bill, would seem to us to be a compliance with the law; but we are of the opinion that the passage of the act by the Legislature is conclusive of the fact that due notice was given. The Constitution requires evidence of such publication to be exhibited to the Legislature before such act shall be passed. This we think is for the purpose of authorizing that body to pass conclusively upon this question of fact. To hold otherwise would be to relegate to the courts the ascertainment of a jurisdictional fact for the Legislature, and to unsettle every special or local law that has been passed since the adoption of the Constitution.

*β.* In view of the decision by us of the question as to the date of the is-suance of the bonds, it becomes immaterial whether that part of the en-abling act directing the city to acquire by arbitration the plant of the Galveston Sewer Company is valid or not, as not having been included in the notice. That much of the section 132d could be held invalid, with-out affecting the validity of the rest which confers the right to issue the bonds. Under its power to construct and establish a system of sewerage the city had the authority to acquire the plant of the sewer company, and the part of the act in question was only a direction to do so.

Article 11, section 7, of the Constitution gives authority to counties and cities bordering on the Gulf of Mexico to create a debt for the con-struction of sea walls, breakwaters, and sanitary purposes upon a vote of the taxpayers as may be authorized by law, and to issue bonds in evi-dence thereof. It may be conceded that the creation of a debt for the construction and establishment of a sewerage system is for sanitary pur-poses, yet there is nothing in the section of the constitution cited to pro-hibit the Legislature from giving the power to be exercised in some other manner.

Due provision was made by the ordinance of December 11, 1897, for payment of the interest and the creation of a sinking fund for the

bonds by the levy of a tax of 10 cents on the $100 valuation of property. The validity of this ordinance is not affected by the delay in the issuance of the bonds, and the provision was made prior to the creation of the debt. Mitchell County v. Bank, 91 Texas, 361; Barrett v. El Paso, 88 Texas, 175; Wade v. Travis County, 174 U. S., 499.

The authority given to the city by the enabling law to appropriate the revenues derived from the system to the payments of interest and the creation of a sinking fund for the bonds does not affect the validity of the provision made in the ordinance, for the law recognizes the provision made by the city, and provides that it may be reimbursed from the revenues of the system for the amounts paid from taxation. For convenience, the ordinance of August 21, 1899, provided that the bonds should be dated as of August 1, 1899. Their issuance had been provided for by the ordinance of December 11, 1897, and the amendatory ordinance fixing a uniform date for them was not invalid because of antedating. Yesler v. Seattle, supra. The statutes regulating the issue of municipal securities recognize the fact that bonds do not bear the date of their sale by the requirement that they shall not be sold for less than par and accumulated interest. The title of the act was sufficient. Nalle v. City of Austin, 56 S. W. Rep., 954; Cattle Co. v. Baker, 56 S. W. Rep., 756; Womack v. Gardner, 10 Texas Civ. App., 367. The notice to the absent alderman was sufficient. There was no more need of re-enacting section 132 of the charter in adding the section 132d than of any other section. Section 132d was an addition to the charter, and not the amendment of any other section that required re-enactment. The tax was voluntarily paid, and the plaintiffs were not entitled to recover it back even if it should be conceded that the court had jurisdiction to allow the recovery.

We are of the opinion, after a careful examination of the questions presented by the record, that the bond issue was valid. The judgment of the court below is reversed on the cross-assignments, and judgment will be here rendered in favor of the defendants.

*Reversed and rendered.*

### ADDITIONAL FINDINGS OF FACT.

On motion of appellants, additional conclusions of fact are stated as follows:

1. The judgment in the arbitration case between the city and the Galveston Sewer Company does not in any particular refer to the bonds in question, and does not give the sewer company any lien upon the bonds or the proceeds of the sale thereof, or any part of either, but is simply a judgment in favor of the sewer company against the city for $93,600. This judgment appears in the statement of facts at page 80 of the record, and is referred to as a part of this conclusion.

2. The bonds were placed on the market by the city August 25, 1899. The public advertisement and circular of the city offering the bonds

for sale bore that date, and gave notice that sealed proposals for the purchase thereof would be opened on September 16, 1899. No bid for the bonds, or any part thereof, was opened or accepted before the 16th day of September, 1899.

3. The city has never received any money or other thing of value on account of the bonds, except that E. H. Gay & Co., whose bid for the bonds at a premium was accepted by the city, deposited on September 16, 1899, with the auditor of the city a certified check for $5000 accompanying their bid, "as a guarantee of good faith," as required by the advertisement inviting bids.

Writ of error refused.