WALTON *v.* ARKANSAS CONSTRUCTION COMMISSION.

4-3914

Opinion delivered April 1, 1935.

*Sam Rorex*, for appellant.

*Rose, Hemingway, Cantrell & Loughborough*, for appellees.

BAKER, J. Amendment No. 20 of the Constitution was adopted November 6, 1934, at the general election. It is as follows:

"Except for the purpose of refunding the existing outstanding indebtedness of the State and for assuming and refunding valid outstanding road improvement district bonds, the State of Arkansas shall issue no bonds or other evidence of indebtedness, pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose."

The plaintiff in this suit invoked the said amendment to prevent the delivery of bonds issued by the State of Arkansas in the sum of $1,327,000 to complete the State Hospital for Nervous Diseases near Benton. The appellee is the Arkansas Construction Commission, hav-

ing the power and duty of the construction of said hospital.

These bonds were sold by the State to the Public Works Administration in July, 1934. They were duly lithographed, signed by the Governor, the Treasurer of the State, and the chairman of the Arkansas Construction Commission, and duly attested by the Secretary of State, and the great seal of the State was affixed.

After the aforesaid bonds had been duly signed as aforesaid, they were registered by the State Auditor, as provided by § 14 of act 180 of the Acts of 1929. The sale so made by the Arkansas Construction Commission to the Public Works Administration was in conformity to a contract, dated April 24, 1934, under which agreement Public Works Administration contracted to pay par for the bonds and contemplated that, in addition to proceeds arising from the sale of said bonds, a grant to be made of approximately 30 per cent. of the costs of the completion of the work, which 30 per cent. would amount to approximately $440,000. Act 4, approved April 18, 1934, expressly authorized the sale of the bonds to the United States or to any of the governmental agencies.

Before the actual sale to the Public Works Administration, and in accordance with a request made by the Public Works Administration, the bonds were duly advertised for sale, but no bid was received therefor.

It was contracted and agreed that delivery of the bonds would be made in installments, or blocks, as the money might be needed by the Construction Commission, whereby interest would be saved to the State.

Immediately after the sale of the bonds to the Public Works Administration was definitely closed, in accordance with the contract previously entered into, the Construction Commission entered into contracts for the completion of the hospital. These contracts so entered into at that time involved the expenditure of not only the amount of the bond issue, but a considerable sum in addition, in all aggregating approximately $1,444,000. These contracts had been duly authorized and were valid outstanding contracts of the State at the time of the adop-

tion of said amendment No. 20. In accordance with the aforesaid contracts so entered into by the Construction Commission, approximately $400,000 worth of material had been bought and actual work had been done at the time of the adoption of amendment No. 20, and the State had been furnished or supplied with $264,000 by the Public Works Administration, in payment upon the bonds aforesaid, and early in December, 1934, the P. W. A. approved for payment requisitions amounting to $214,000. A large portion of the work has been done toward the completion of the buildings for the hospital, but such buildings have not approached a degree of completion so that they may be used at this time. Much more work is necessary for the completion of the hospital before it can be occupied or used by the State.

After the execution of the aforesaid bonds, as hereinbefore stated, and after the registry by the State Auditor, as required by law, the bonds were placed as if in escrow, with the Federal Reserve Bank for safekeeping, and for delivery from time to time as money might be furnished to the State by the Public Works Administration. The said bonds remained with the Federal Reserve Bank for several months, but finally the bank, fearing some liability might accrue by reason of its custody of the bonds, requested a removal of the bonds, and they were then deposited with the Treasurer of the State for delivery to the Public Works Administration, as provided by the contract.

Although such deposit of the bonds with the Federal Reserve Bank did not constitute in all respects a legal escrow, nor make the Federal Reserve Bank in strict legality an escrow agent, it was the intention of the Construction Commission to so regard the Federal Reserve Bank and the State Treasurer upon the deposit of the bonds in that office.

The appellant filed this suit in the chancery court of Pulaski County, praying for an order restraining the Construction Commission from delivering the bonds, and particularly the block of $440,000, which the Construction Commission intends to deliver, in accordance with

the contract, for money ready to be paid over on requisition of the Construction Commission.

Answer was filed admitting the above and foregoing facts, that the Commission intended to deliver the bonds, and pleading also that it intended to deliver from time to time, in accordance with the terms and conditions of the contract, as money might be required and bonds be paid for under the aforesaid contract entered into between the Construction Commission and the Public Works Administration, and pleading further the contracts of the State as valid and binding, and constituting an outstanding indebtedness at the time of the adoption of the amendment, and that on account thereof the said issue of bonds was expressly exempted from the effect of the constitutional amendment No. 20.

The facts were agreed upon, and the contract between the Arkansas Construction Commission and Public Works Administration became a part of the stipulation, together with other facts substantially as hereinbefore stated. One of the matters stipulated is as follows: "All contracts for completion of the work on the hospital at Benton have been let, and the work is in progress, and the total expended and to be expended since the sale of said bonds to the Government, in July, 1934, will aggregate approximately $1,650,000 to $1,750,000, the cost of which will be paid by the proceeds of said sale of said bonds to the Government, and approximately $440,000 of grant to be made by the Government under its contract.

"That of the said bond issue, the Government has paid for $264,000 of bonds, and bonds Nos. 1 to 264, inclusive, have been delivered to the Government.

"That on November 2, 1934, there was due and owing by the State on the contracts for completion of the building approximately $400,000, being for work done and material furnished under the construction contracts in the sum of $1,449,828.90 let on July 6, 1934, and other contracts let shortly after that date but before November 6, 1934."

Upon trial in the chancery court, the court denied the relief prayed for, holding that the bonds executed, delivered and ready for delivery, are expressly exempted from the effects of amendment No. 20.

This appeal is to test the accuracy of this decision of the chancery court.

It will be observed that the State may issue bonds for two purposes, as exceptions, to the effect of amendment No. 20. First, for the purpose of refunding the existing outstanding indebtedness of the State. Second, for assuming and refunding valid outstanding road improvement district bonds.

If the bonds in question in this suit come under the first provision or exception, then the State may deliver the bonds under the contract made by the Construction Commission with the Public Works Administration.

It must always be the purpose to construe or apply any provision of the Constitution to effectuate, as nearly as possible, the intent of the people as it may be interpreted from the measure, and, when necessary for that purpose, a liberal interpretation will be warranted.

As we read and understand amendment No. 20, it furnishes us a key for its own interpretation. It is not difficult to understand the evils that it was intended to meet and correct, but it was not passed or adopted by the people as a measure for the repudiation of debts or valid obligations. It expressly exempts from its effect existing outstanding indebtedness of the State. It must be construed with a view to the conditions prevailing at the time, with regard to law justifying, and under which debts of the State may have been created and that were then or would be unpaid and outstanding valid obligations of the State at the time of the election, at which it was submitted for adoption.

The dictionary defines "indebtedness" as "(1) state of being indebted; (2) sum owed, debts, collectively." "Indebted" is defined as "brought into debt; being under obligation; held to payment or requital; in debt." Webster's International Dictionary, Second Edition.

There is no question therefore about the fact of the outstanding indebtedness, but it is argued that the outstanding indebtedness is for money that had already been furnished or supplied for bonds delivered prior to November 6, the date of the election, and does not include bonds not yet delivered. With this theory we cannot agree. The obligation existed when the contracts were made for the completion of the State Hospital buildings. It has continued since that date. Contractors, in the performance of the agreements made with the Construction Commission, no doubt, arranged for the complete and entire performance of their several agreements. They necessarily incurred expenses which they in turn must meet, and these obligations were incurred, relying in good faith on duly authorized acts of agents, duly impowered and acting within that power for the State.

If the State should breach the contractual obligations it has made to these several contractors, most serious results would follow, affecting not only the contractors, but also the good name and honor of the State. No honest citizen who meets his own obligations, or who is willing to do so, would have been willing to vote for the passage of an act or amendment to the Constitution of the State that would have amounted to a repudiation of its contracts, lawfully entered into, made for the benefit of the State.

Therefore outstanding indebtedness must mean obligations already validly fixed, the performance of which is necessary, acting in good conscience, as honest individuals would act, or otherwise be required to act by law. We must determine that amendment No. 20 was adopted by the people of the State with the view that the State would discharge in good faith its contractual duties.

A failure to give this effect to the exception in the amendment would in effect be giving the amendment the effectual force to justify and duly authorize the breach of contracts and to make the State liable morally, if not legally, for damages on account thereof, without any corresponding benefit to be derived therefrom.

We are not justified in assuming that, although State officials and agencies created for the purpose by the Legislature have worked unceasingly for the refunding of debts, we have been unable to pay, according to contractual maturities, the people intended, as a climax of all of these struggles, to vote for a repudiation of obligations of equal force and validity. A remembrance of these conditions and a knowledge of the evils to be corrected impel these conclusions under the authority of *Lybrand* v. *Wafford*, 174 Ark. 298, 296 S. W. 729.

Moreover, to issue bonds does not necessarily mean or include delivery thereof. The language of the Legislature authorizing the issue of bonds does not so use the word "issued." Section 14, act 180, of Acts of 1929. The writer recalls that section 2 of act 180, of Acts of 1917, treats school bonds as "issued" before registration by the county treasurer. There may be other instances, but it is not necessary that we find or cite them. The foregoing will illustrate the fact that in some instances "to issue" might not contemplate or include delivery. In this case the bonds are held for the Public Works Administration, subject to a manual delivery on demand.

A case almost exactly similar to the one under consideration here is that of *Miller* v. *City of Galveston*, 23 Tex. Civil App. 693, 57 S. W. 1116, 1119. In that case the court said: "The bonds have been issued and they have been duly executed. Their deposit with the comptroller for registry leaves nothing but a ministerial act to be performed by him, which should be regarded as done on the day of deposit. * * * Our conclusion is that the bonds had been issued within the meaning of the law when the act of 1899 went into effect, and the fact that the proposition to issue them was not submitted to the property taxpayers does not render them invalid."

Appellant relies upon the case of *Ellis* v. *Jonesboro Trust Co.*, 179 Ark. 620, 17 S. W. (2d) 324, and upon the case of *Stranahan, Harris & Oatis, Inc.*, v. *Van Buren County*, 175 Ark. 678, 300 S. W. 382, for a legal definition of the word "issue," but it must be remembered that in those cases there were different conditions and facts

under consideration by the court, as well as a different context, wherein the word "issue" was used. Here we have other conditions. We have a different setting or context wherein the same word has been used, and clearly with a more restricted meaning than that sometimes given to it, and for that reason our view here impels in no sense an impairment of the foregoing cases. For instance, in § 14 of act 180, of the Acts of 1929, we find the following language: "When any bonds shall have been issued, they shall be registered in the office of the State Auditor in a book to be provided for that purpose, etc."

The foregoing could not have contemplated a delivery, yet these same bonds in controversy here are treated by the legislative acts as already issued prior to the registration. It is on this account that we think the case of *Miller* v. *City of Galveston, supra,* is peculiarly applicable here.

There is another reason, not less potent than those we have already urged. We have already suggested and argued the validity of the contracts entered into by the Construction Commission and contractors, and also the effect of a breach of those contracts on the part of the State. If we should assume that the bond issue for the completion of the State Hospital comes within the inhibition of amendment No. 20, the results necessarily would follow that the State ought to be liable for consequential damage arising out of the breach of the several contracts and that the State should, in the honest discharge of its obligations, pay these damages.

It follows therefore, if such should be our decision, that, contemporaneously with the adoption of amendment No. 20, we create by its adoption a new indebtedness arising out of legal contracts validly and openly negotiated. This would have to be paid unless we adopt a policy of repudiation, which has never been contemplated.

So we must hold, under such authority as *State ex rel.* v. *Board of Education,* 114 Ohio State 602, 151 N. E. 669, that the word "indebtedness" embraces and includes obligations incurred by the State as shown in this

case. *Maulding* v. *Williams,* 330 Ill. 599, 162 N. E. 131; *Gray* v. *Bennett,* 3 Metcalf 522; *State* v. *Georgia Co.,* 112 N. C. 34, 17 S. E. 10. And under the statutes and authorities cited that the bonds involved in this suit have already been issued. *Estabrook & Co.* v. *Consolidated Electric Power & Gas Co.,* 112 Md. 643, 90 Atl. 523; *Georgia Life Ins. Co.* v. *Lassiter,* 17 Ga. App. 621, 87 S. E. 922.

It therefore follows that the chancery court was correct in the decree rendered. It is therefore affirmed.