Barbara Ann PAKAY *v.* Tabatha DAVIS

06-360                                                                          241 S.W.3d 257

Supreme Court of Arkansas
Opinion delivered October 12, 2006

*Peel Law Firm, P.A.*, by: *Jennifer L. Modersohn*, for appellant.

*Van Kleef, Kelley & Collins*, by: *Roy Beth Kelley*, for appellee.

Tom Glaze, Justice. On April 6, 2005, Appellant Barbara Pakay filed suit against Appellee Tabatha Davis. Barbara alleged that she had entered into a contract for deed with Tabatha, and the 8% interest rate she was charged was usurious under Article 19, Section 13 of the Arkansas Constitution, also known as Amendment 60. Amendment 60 established that Arkansas' maximum lawful rate of interest on any contract shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract. Tabatha answered, contending that the interest rate in the parties' contract was not usurious. Barbara later amended her complaint to also assert her claim against Tabatha's husband, Bryan Davis. Tabatha and Bryan both moved to dismiss the amended complaint, alleging that Bryan was not a party to the contract. On July 6, 2005, the circuit court dismissed Barbara's claim against Bryan.

On September 12, 2005, Tabatha filed a motion for summary judgment in which she submitted that, because the Federal Reserve Discount Rate had been abolished effective January 9,

2003, prior to Barbara and Tabatha's contract, there was no longer a way to calculate what constitutes usury under the Arkansas Constitution. In reply, Barbara contended that, as a matter of law, the Federal Reserve Board replaced the Federal Reserve Discount Rate with the "primary credit rate." Having decided that legal issue, Barbara submitted that because the primary credit rate was 2.00% at the time of the parties' contract, the maximum interest rate permissible under Arkansas law was limited to 7.00% (no more than 5% per annum above the primary credit rate). Accordingly, Barbara asserted that the 8% interest rate charged by Tabatha was usurious.

The circuit court granted Tabatha's motion for summary judgment. From that order, Barbara timely appeals two issues: (1) the trial court erred in dismissing Bryan from the lawsuit and (2) the trial court erred in granting Tabatha summary judgment. We reverse the circuit court on both points.

We begin with Barbara's second point on appeal, wherein she seeks to clarify what standard, if any, should be used to determine what is usurious under Amendment 60 to the Arkansas Constitution now that the Federal Reserve Discount Rate no longer exists. As noted earlier, the circuit court granted Tabatha's motion for summary judgment, finding that, absent the Federal Reserve Discount Rate, there is no longer a standard in Amendment 60 to limit interest rates and determine what constitutes usury.

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Hanks v. Sneed*, 366 Ark. 371, 235 S.W.3d 883 (2006); *Fegans v. Norris*, 351 Ark. 200, 89 S.W.3d 919 (2002). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Hanks, supra.* On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.*

While Barbara and Tabatha appear to agree on most of the essential facts, it is the law that is in dispute in this case. Both parties

admit that they willingly entered into a contract for deed, wherein Tabatha charged Barbara $79,000 for real property. Moreover, the parties also admit that Barbara was charged 8% interest on that land for a period of 300 months. On appeal, however, Barbara contends that, because there is no longer a Federal Reserve Discount Rate to calculate the maximum lawful rates of interest as provided by Amendment 60, the Federal Reserve Board's "primary credit rate" is the gauge by which we determine what is usury under our Constitution. In reply, Tabatha submits that, because the contract for deed was entered into after the abolition of the Federal Reserve Discount Rate, Amendment 60 no longer provides a maximum interest rate. At the summary judgment hearing, the circuit court reasoned:

> I'm gonna grant the motion for summary judgment. . . . Article 19, Section 13 of the Arkansas Constitution establishes the maximum lawful rate of interest at "5% above the Federal Discount Rate at the time of the contract." But the Federal Discount Rate was abolished prior to the date of this contract. And I'm aware of the Attorney General's opinion cited that the Attorney General basically said that the Supreme Court would look for some way to save the Constitutional Amendment by trying to adopt — there's more than one new discount rate that substitutes for this Federal Discount Rate.

> But the Federal Discount Rate cited in Article 19, Section 13 of the Constitution — it's capitalized. It specifically refers to the Federal Discount Rate. It says it "means the Federal Reserve Discount Rate," and it's capitalized, "on a ninety-day commercial paper in effect in a Federal Reserve District." Well, that Federal Discount Rate has been abolished. . . .

> Now, the Supreme Court may well want to do that but, I think based on what I'm seeing here, I cannot rewrite the Constitution of this State. And I'm not going to. . . . Now, they could have done this a lot of ways when they passed this amendment. They could have said the Federal Discount Rate and any other similar rate hereafter adopted, but they wanted to hang their hat on this hook. And the hook isn't on the wall anymore. So you can't hang the hat there anymore.

> . . . .

> I'm just interpreting that amendment to say that that Discount Rate no longer exists. It is just not applicable to this case and I don't guess any other case.

We reverse the circuit court's order of summary judgment.

Article 19, section 13, of the Arkansas Constitution (Amendment 60) provides in relevant part as follows:

(a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof *shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate* at the time of the contract.

(ii) All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.

. . . .

(c)(ii) "Federal Reserve Discount Rate" means the Federal Reserve Discount Rate on ninety-day commercial paper in effect in the Federal Reserve Bank in the Federal Reserve District in which Arkansas is located.

Ark. Const. art. 19, § 13 (emphasis added).

Admittedly, the plain language of Article 19, section 13 of our Constitution (Amendment 60) provides that the maximum rate of interest charged shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate. However, as of January 9, 2003, the Federal Reserve Board abolished the Federal Reserve Discount Rate. *See* 12 CFR § 201.4 (2003). At the same time, however, the Board adopted the primary credit rate, the secondary credit rate, and the seasonal credit rate. *Id.*

*In construing provisions of the Arkansas constitution, we endeavor to effectuate as nearly as possible the intent of the people (as it may be ascertained from the language of the provision) in passing the measure, and, if necessary, as a means of attaining that end, a liberal interpretation will be warranted. See Raney v. Raulston, 238 Ark. 875, 878, 385 S.W.2d*

651, 653 (1965) (emphasis added) (citing *Walton v. Arkansas Construction Commission*, 190 Ark. 775, 80 S.W.2d 927 (1935)). Without question, when the people of this State adopted Amendment 60, their intent was to implement limits on interest rates, not eliminate such limits. Amendment 60's plain language illustrates that intent by establishing an objective gauge in order to determine what is usurious under the law. While the Federal Reserve Board abolished the Federal Reserve Discount Rate, it merely substituted a different, but similar, measurement in its place. In this respect, the primary discount rate offers, much like the Federal Reserve Discount Rate offered, a means by which rates of interest can be limited.[1] Thus, while the Federal Reserve Discount Rate

---

[1] The Federal Reserve Board's website explains the various types of credit rates available:

> The discount rate is the interest rate charged to commercial banks and other depository institutions on loans they receive from their regional Federal Reserve Bank's lending facility — the discount window. The Federal Reserve Banks offer three discount window programs to depository institutions: primary credit, secondary credit, and seasonal credit, each with its own interest rate. All discount window loans are fully secured.

> Under the primary credit program, loans are extended for a very short term (usually overnight) to depository institutions in generally sound financial condition. Depository institutions that are not eligible for primary credit may apply for secondary credit to meet short-term liquidity needs or to resolve severe financial difficulties. Seasonal credit is extended to relatively small depository institutions that have recurring intra-year fluctuations in funding needs, such as banks in agricultural or seasonal resort communities.

> The discount rate charged for primary credit (the primary credit rate) is set above the usual level of short-term market interest rates. (Because primary credit is the Federal Reserve's main discount window program, the Federal Reserve at times uses the term "discount rate" to mean the primary credit rate.) The discount rate on secondary credit is above the rate on primary credit. The discount rate for seasonal credit is an average of selected market rates. Discount rates are established by each Reserve Bank's board of directors, subject to the review and determination of the Board of Governors of the Federal Reserve System. The discount rates for the three lending programs are the same across all Reserve Banks except on days around a change in the rate.

The Federal Reserve Board, <http://www.federalreserve.gov/monetarypolicy/discount-rate.htm> (Oct. 9, 2006). *See also* 12 CFR § 201.4 (2003). Thus, it is clear to us that the primary credit rate, in comparison with the secondary credit and seasonal credit rate, is most like the former Federal Reserve Discount Rate.

has been abolished by the Federal Reserve Board, the Board adopted a gauge that can apply in its place.

■ Under our standard of review of constitutional provisions, as a means of attaining the clear intent of the people, a liberal interpretation is warranted. *Raney v. Raulston, supra.* In order to comply with the intent of the people, our obligation is to apply *some* standard, regardless of its name or title given by the Federal Reserve Board. Thus, we conclude that under our standard of review for such a constitutional provision, the circuit court erred in concluding there is no longer a standard to gauge usury under the law.[2] The primary credit rate should be applied in the place of the Federal Reserve Discount Rate. This conclusion requires the circuit court on remand to determine what the primary credit rate was on the date that Barbara and Tabatha entered their contract.[3] *See Bank of America v. C.D. Smith Motor Co.*, 353 Ark. 228, 250, 160 S.W.3d 425, 438 (2003).

Barbara's next argument is that the circuit court should not have dismissed Bryan from the lawsuit. We review a trial court's decision on a motion to dismiss by treating the facts alleged in the complaint as true and by viewing them in the light most favorable to the plaintiff. *Hanks v. Sneed, supra.* In viewing the facts in the light most favorable to the plaintiff, the facts should be liberally construed in the plaintiff's favor. *Id.* Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. *Id.*

---

[2] In 2002, the State's attorney general issued an opinion, published on this exact issue, reasoning that the primary credit rate would effectively replace the Federal Reserve Discount Rate in Amendment 60. In reaching this decision, the attorney general evaluated other instances in our case law where strict compliance with a constitutional amendment was impossible. *White v. Hankins*, 276 Ark. 562, 637 S.W.2d 603 (1982); *Drennan v. Bennett*, 230 Ark. 330, 322 S.W.2d 585 (1959). The attorney general's opinion noted that, in those instances where strict compliance with a constitutional amendment was impossible, our supreme court has always looked at the intent and purpose of the amendment rather than the literal language. However, the attorney general's opinion assumes that there can no longer be strict compliance with Amendment 60. In other words, the attorney general's opinion suggests that there has been a substantive change in the existing constitutional provision. Yet, with respect to Amendment 60, there has not been a substantive change, as there is still a gauge in place by which courts can determine what is usurious under the law.

[3] As mentioned earlier, Barbara contends that the primary credit rate was 2.00% on the day the parties entered the contract. Yet, the record is void of proof of that contention.

Barbara's amended complaint alleged that Tabatha and Bryan were husband and wife and owned the real property in question. Barbara also alleged that Tabatha and Bryan were both jointly and severally responsible for Tabatha's actions. However, Bryan strongly argued he was not a party to the contract dispute. As previously mentioned above, the circuit court dismissed Bryan from the lawsuit. Based on the facts as alleged in Barbara's amended complaint, we conclude that the circuit court erred.

A case that is instructive on this point is *Griffin v. Flemister*, 252 Ark. 907, 481 S.W.2d 718 (1972). In that case, the Flemisters, sellers of real property, sought an action for specific performance against the Griffins, potential buyers of real property. Leading up to the lawsuit, Mrs. Griffin, with her husband's authority, offered $72,000 for the home, but that offer was rejected by the Flemisters. Later, *without* Mr. Griffin's authority, Mrs. Griffin made the Flemisters a counteroffer for $80,000. The $80,000 offer was accepted, but Mr. Griffin, after finding out about his wife's $80,000 offer, declared that he did not want to be bound by that offer. In concluding that Mr. Griffin was bound to the contract with the Flemisters, we stated the following:

> "The husband is not an agent for the wife solely by reason of the marital relationship. But slight evidence of actual authority is sufficient proof of the agency of the husband for the wife in matters of domestic nature." 41 C.J.S. *Husband and Wife* § 70 p. 549. Agency may be established by circumstantial evidence. *Williams v. O'Dwyer & Ahern Company*, 127 Ark. 530, 192 S.W. 899; *Sidle v. Kaufman*, 345 Pa. 549, 29 A.2d 77, 81. In the *Sidle* case, the court said: "The relationship of agency cannot be inferred from mere relationship or family ties unattended by conditions, acts, or conduct clearly implying an agency . . . ; but such relation is competent evidence when considered with other circumstances as tending to establish the facts of agency and where there has been other competent evidence tending to the same end." And, it is said in Restatement of Agency, § 22: "Neither husband nor wife by virtue of the relationship has power to act as agent for the other. The relationship is of such a nature, however, that circumstances which in the case of strangers would not indicate the creation of authority or apparent authority may indicate it in the case of husband and wife."

*Griffin v. Flemister*, 252 Ark. at 910, 481 S.W.2d at 720 (quoting *Cooper v. Cooper*, 225 Ark. 626, 284 S.W.2d 617 (1956)). The *Griffin* court continued as follows:

With further regard to agency, in the early case of *Johnson v. Arkansas Foundry Co.*, 173 Ark. 1181, 292 S.W. 373 (omitted from Arkansas Reports because 'of no value as a precedent'), this court stated:

> "As we have said, the only question in the case is a question of agency, a question of fact, and Ruby Johnson testifies that she was the agent; and this court has said:
>
> 'The existence of an agency cannot be shown by proving the acts and declarations of the agent, but the agent may himself testify in regard to his agency and the extent of his authority.' "
> *De Camp v. Graupner*, 157 Ark. 578, 249 S.W. 6.
>
> This court has held many times that, while you cannot prove agency or the extent of an agent's authority by the declarations or the acts of an agent, you can prove agency by the agent himself.

*Griffin v. Flemister,* 252 Ark. at 910-11, 481 S.W.2d at 721. Based on the above-quoted analysis, the *Griffin* court concluded that Mr. Griffin was bound to the contract entered into by his wife. The facts supported a finding that Mrs. Griffin was acting as her husband's agent.

In the instant case, assessing the allegations in the amended complaint, the circuit court should not have dismissed Bryan from the suit because, under agency principles, Bryan could be bound to the contract entered into by his wife. Of course, to establish an agency relationship, the circuit court would have to examine the evidence. However, by dismissing Bryan from the action, such dismissal left no room for the examination of all relevant evidence on this agency issue. In short, only the facts of the case can reveal whether Tabatha was acting as an agent on behalf of herself and Bryan; however, if she was, Bryan would surely be bound to the terms of the contract.

We note that Tabatha relies on *Gardner v. Bullard*, 241 Ark. 75, 406 S.W.2d 368 (1966), but that case is factually distinguishable. In that case, twenty men signed their names on a petition opposing a drainage district. However, their wives did not sign the petition, and we concluded on appeal that the wives were not parties to the petition. *Id.* The *Gardner* case, unlike the one now before us, did not involve a contract, whereby a husband or

wife *may* act as an agent on the behalf of the other. *See Griffin v. Flemister, supra.* More so, the signing of a petition does not lend itself to agency principles like negotiating a contract. We find no merit in Tabatha's argument, and reverse the circuit court on this point.[4]

Reversed and remanded.

---

[4] Tabatha also asserts that Amendment 60 is unconstitutional, arguing that, under the 14th Amendment to the U.S. Constitution, Amendment 60 is void for vagueness and that it violates her substantive due process rights. However, the circuit court did not make a specific ruling on any of her constitutional arguments, likely because it ruled in her favor when it granted her motion for summary judgment. Absent a specific ruling on the constitutional claims, we are precluded from addressing them on appeal. *See Smith v. Smith*, 363 Ark. 456, 215 S.W.3d 626 (2005).